NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-975                                            Appeals Court

COMMONWEALTH  vs.  JOHNNY J. EVANS.

No. 14-P-975.

Suffolk.      March 16, 2015. - July 31, 2015.

Present:  Katzmann, Milkey, & Agnes, JJ.

Controlled Substances.  Practice, Criminal, Motion to
     suppress. Constitutional Law, Search and seizure,
     Investigatory stop, Reasonable suspicion.  Search and
     Seizure, Threshold police inquiry, Reasonable
     suspicion.  Threshold Police Inquiry.

Complaint found and returned in the Roxbury Division of the
Boston Municipal Court Department on April 17, 2013.

A pretrial motion to suppress evidence was heard by David
B. Poole, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Ralph D. Gants, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by him to the Appeals Court.

Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.
Rebecca A. Jacobstein for the defendant.

MILKEY, J.   During a street encounter that occurred in the Upham's Corner neighborhood of the Dorchester section of Boston, Boston police discovered a bag of "crack" cocaine inside the defendant's mouth.   The Commonwealth charged the defendant with possession of that cocaine in violation of G. L. c. 94C, § 34. After holding an evidentiary hearing, a Boston Municipal Court judge allowed the defendant's motion to suppress the cocaine. On the Commonwealth's interlocutory appeal of that ruling, we affirm.

Background.   When reviewing a decision on a motion to suppress, we accept the judge's findings of fact absent clear error, but make an independent determination whether the judge correctly applied constitutional principles to the facts as found.   Commonwealth v. Lyles, 453 Mass. 811, 814 (2009).   The following recitation is drawn from the judge's careful findings, none of which the Commonwealth has demonstrated to be clearly erroneous.

At approximately 2:00 A.M. on March 11, 2013, the defendant was walking alone along Humphreys Street toward Humphreys Place. There, he was spotted by Boston police Officers Dodd and Conley who, dressed in plain clothes, were traveling in an unmarked police cruiser.   As the judge found, the officers had not "been dispatched to the area for a specific report of a crime or otherwise"; instead they were on routine patrol "in the area

they covered."  When they saw the defendant, they did not recognize him or "know him from any prior interactions." Rather, to them, "[h]e was just a person walking on the street."

The defendant spotted the unmarked vehicle trailing him, and he turned left onto Humphreys Place when he reached it.[1]  At that point, "Officer Dodd, who was driving, turned his [car] onto Humphreys Place and followed [the defendant] until he got up as far as [the defendant w]as walking."  While still in their vehicle, the officers proceeded to ask the defendant where he was going.  The defendant answered that he lived on Humphreys Place and was returning home (a statement that the police admitted they had no reason to question).  The defendant "looked around" while being questioned, and "Officer Dodd thought that [he] appeared to be nervous."  At one point, the defendant placed his hands in his pockets, and "Officer Dodd directed [him] to take his hands out of his pockets."  The defendant "hesitated" and then complied.  Nevertheless, both officers left

---

[1] Officer Dodd (the only witness at the hearing on the motion to suppress) testified that the defendant's turn onto Humphreys Place was "sudden," and that the defendant subsequently indicated that he lived on Humphreys Place.  The judge made no finding that the defendant's turn was "sudden," nor did he explicitly reject it.  In any event, under these circumstances, we see little of consequence in whether the defendant's turn onto Humphreys Place was "sudden" or not.  It is hardly remarkable that someone walking home alone at 2:00 A.M. in what police described as a dangerous area who found himself being trailed by an unmarked car would want to take a sudden turn onto the side street where he lived.

their vehicle and "walked right up to him on the sidewalk" to continue their questioning of him. They were carrying service weapons (although their guns were not drawn), and their badges were visible around their necks.

During his questioning of the defendant on the sidewalk, "it appeared to Officer Dodd that [the defendant] had something in his mouth from his manner of speaking." In response to a direct question as to what he had in his mouth, the defendant answered, "[N]othing," and he then opened his mouth to demonstrate this. "[A]s soon as [the defendant] opened his mouth," Officer Dodd used his flashlight to examine the inside of the defendant's mouth, and in this manner he was able to see a bag containing what appeared to be crack cocaine wedged between the defendant's tongue and cheek.[2]

After the defendant refused to spit out the observed bag "and appeared to be trying to swallow it[,] Officer Dodd took hold of [the defendant's] jaw" and eventually induced the defendant to spit it out. The officers arrested the defendant and searched him incident to that arrest. Finding "nothing further" on the defendant, and apparently having no reason to question the defendant's postarrest statement that "I was just

---

[2] The Commonwealth argues that the judge committed clear error in finding that Officer Dodd did not see anything in the defendant's mouth prior to using the flashlight. However, Officer Dodd himself expressly acknowledged that he "couldn't see what was in [the defendant's] mouth without a flashlight."

going home to get high," the officers released him to be summonsed at a later date.

Discussion.  The dispute before us is relatively narrow. The defendant appropriately acknowledges that the officers' initial decision to focus on him did not constitute a seizure. See Commonwealth v. Franklin, 456 Mass. 818, 822 (2010) (following a person, without some other show of authority, is not a seizure).  The fact that the police offered no justification for deeming the defendant worthy of investigation does not turn their initial actions into a seizure.[3]  Similarly, the defendant concedes that once the police observed what appeared to be a bag of crack cocaine in his mouth, they had reasonable suspicion to seize him (indeed, there plainly was probable cause at that juncture).  Thus, the issues before us are whether the defendant was "seized" at some point before the police observed the bag of cocaine in his mouth and, if so, whether they had reasonable suspicion at that time.  See ibid. See also Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007) (courts are to determine first at what point the defendant was seized).  The motion judge found that the defendant was seized

---

[3] At the suppression hearing, Officer Dodd testified that "[r]ight at the area of Dudley and Humphreys Street [he] observed a black male [who turned out to be the defendant] walking on Humphreys Street towards Humphreys Place" and that he then decided to follow this person.  Officer Dodd did not offer, nor was he specifically asked, why he and his partner decided to follow the defendant.

for purposes of art. 14 of the Massachusetts Declaration of Rights by the time he opened his mouth.[4]  The Commonwealth argues that the defendant was not seized until the point at which Officer Dodd ordered the defendant to spit out the cocaine, after the police had conducted their flashlight examination of the inside of his mouth.  Commonwealth v. Thomas, 38 Mass. App. Ct. 928, 928 (1995).

To determine when the defendant was seized, our inquiry is a fact-specific one:  whether "if, in view of all the circumstances surrounding the incident," those circumstances were "sufficiently intimidating that a reasonable person would believe that he was not free to turn his back on his interrogator and walk away."  Commonwealth v. Barros, 435 Mass. 171, 173-174 (2001), quoting from and citing United States v. Mendenhall, 446 U.S. 544, 554-555 (1980) (opinion of Stewart,

---

[4] In his motion to suppress, the defendant invoked both the Fourth Amendment to the United States Constitution and art. 14. The motion judge analyzed the defendant's claims under art. 14 and did not specifically mention the Fourth Amendment.  The Supreme Judicial Court has held that art. 14 "provides more substantive protection than does the Fourth Amendment in defining the moment when" a seizure occurs.  Thus, we consider the seizure in the present case under the "more stringent standards of art. 14 with the understanding that, if these standards are satisfied, then so too are those of the Fourth Amendment."  Commonwealth v. Lyles, 453 Mass. at 812 n.1.  In his brief, the defendant does not specify how, if at all, our cases in this area differ from Federal cases, but cites both Federal and Massachusetts cases in support of his argument. Accordingly, we look to cases decided under Federal law as well as those decided under art. 14.  See Commonwealth v. Williams, 422 Mass. 111, 115 n.9 (1996).

J.).  Furthermore, "[t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation."  <u>Michigan</u> v. <u>Chesternut</u>, 486 U.S. 567, 573 (1988).  See <u>Commonwealth</u> v. <u>Rosado</u>, 84 Mass. App. Ct. 208, 212 (2013) (observing that "analysis of events in the stop and frisk context" requires the facts to be examined as a whole, "not in isolation").[5]  Whether, and when, a seizure has occurred "will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."  <u>Michigan</u> v. <u>Chesternut</u>, 486 U.S. at 573.

We conclude that a reasonable person would not have felt free to terminate the encounter, at the latest, when Officer Dodd asked the defendant what was in his mouth.  The encounter took place while the defendant was walking alone in the dark early hours of the morning.  See <u>United States</u> v. <u>Washington</u>, 490 F.3d 765, 772 (9th Cir. 2007) ("[A]lthough the encounter took place on a public street, it happened around 11:30 <u>P</u>.<u>M</u>. in lighting that required [the officer] to use a flashlight").  In this late night setting, the defendant was trailed by an

---

[5] The Commonwealth in effect seeks to analyze separately each action taken by the officers to determine whether that particular action was a seizure.  By taking each action in isolation divorced from context, the Commonwealth fails to address whether, in light of all the circumstances in their totality, the encounter constituted a seizure.

unmarked vehicle that then pulled up right alongside him, and he was asked where he was going. The defendant was alone, while there were two officers who were armed and wore their badges. See Commonwealth v. Lyles, 453 Mass. at 815 (presence of two armed plain clothes officers who were displaying their badges contributed to encounter being sufficiently intimidating).[6] We agree with the Commonwealth that the initial questioning by Officer Dodd from inside the cruiser did not rise to the level of a seizure. However, what started as a consensual interaction eventually "matured" into a seizure. Id. at 817. The fact that Officer Dodd subsequently directed the defendant to take his hands out of his pockets did not itself effect a seizure of him.[7] See Commonwealth v. Fraser, 410 Mass. 541, 543 (1991). However, it did mark the officers' escalating exercise of authority and

---

[6] See also United States v. Bloom, 975 F.2d 1447, 1454 (10th Cir. 1992) (holding that the questioning of one suspect by two agents increased the encounter's coerciveness and tipped the scale in favor of finding a seizure); United States v. Washington, 490 F.3d at 771 (explicitly considering the number of officers as a factor in the seizure analysis and finding that presence of two uniformed officers was coercive). In United States v. Mendenhall, 446 U.S. at 554, the Supreme Court noted that the number of officers present is one factor that may increase the intimidating nature of an encounter.

[7] In its brief, the Commonwealth characterizes the officer's tone as a mere "request," apparently drawing from Officer Dodd's testimony at the motion hearing that his tone was "conversation[al]." The motion judge, however, found that Officer Dodd "directed" the defendant to remove his hands from his pockets. The Commonwealth has not argued that this finding was clearly erroneous.

control over him.  After the defendant hesitated (though ultimately complied), both officers responded by exiting the cruiser and "walk[ing] right up to him," eliminating any physical distance between themselves and the defendant. In Commonwealth v. Barros, 435 Mass. at 175, the Supreme Judicial Court found the fact that an officer exited his cruiser after the defendant's apparent refusal to cooperate to be "highly relevant" in determining whether a police interaction had escalated to the point where a reasonable person would not have felt free to leave.

After the officers got out of their vehicle, Officer Dodd again asked the defendant where he was going, to identify himself, and "what he was doing," and then asked him what was inside his mouth.  In this manner, the questioning became more pointed and accusatory in tenor.  See United States v. Savage, 889 F.2d 1113, 1115, 1117 (D.C. Cir. 1989) (encounter escalated into a seizure after questioning became "direct" and "forceful"); United States v. Dapolito, 713 F.3d 141, 153 (1st Cir. 2013) (encounter made more intimidating due to the "intensification" and "accusatory nature" of the questioning). Considering all these circumstances, we conclude that the interaction became sufficiently intimidating such that a reasonable person would feel compelled to respond to the pointed question about what was in his mouth.  See Commonwealth

v. Lopez, 451 Mass. 608, 610-611 (2008).  In short, by the time the defendant was asked what was inside his mouth, the encounter had transgressed the bounds of mere questioning and ripened into a seizure.[8]

Having concluded that the defendant was seized when the officer inquired what was in his mouth, we next consider whether this seizure was supported by specific, articulable facts giving rise to reasonable suspicion.  For reasonable suspicion, "[a] mere hunch is not enough."  Commonwealth v. Brown, 75 Mass. App. Ct. 528, 532 (2009) (citations omitted).  The Commonwealth has not actually argued on appeal that reasonable suspicion of criminal activity existed at the time the defendant was asked what was in his mouth.  Therefore, the issue has been waived. See Commonwealth v. French, 462 Mass. 41, 47 (2012); Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).[9]  In any event, we

---

[8] To be clear, we note that we are not relying on the argument highlighted in the defendant's brief that we should consider race as a circumstance in the objective seizure inquiry.  Such a suggestion was not raised below, it is unnecessary to resolution of this appeal, and it seems at odds with Commonwealth v. Lora, 451 Mass. 425, 436 (2008), in which the Supreme Judicial Court held that claims of racially biased law enforcement are properly brought as equal protection claims under arts. 1 and 10 of the Massachusetts Declaration of Rights rather than art. 14.  See Whren v. United States, 517 U.S. 806, 813 (1996) (rejecting the argument that race is a relevant consideration in the Fourth Amendment context).

[9] The Commonwealth also did not make this argument before the motion judge.  See Commonwealth v. Silva-Santiago, 453 Mass. 782, 795 (2009).

are satisfied that such suspicion was lacking here.  All that the Commonwealth established was that the defendant appeared to be "a little nervous" and that, while speaking, he sounded as though he had something in his mouth.  As to the defendant's "nervous" appearance, our cases have consistently held that "a defendant's nervous movements or appearance alone is insufficient" to create reasonable suspicion.  Commonwealth v. Brown, 75 Mass. App. Ct. at 533.  Nor does the defendant's appearance of having something in his mouth suffice to create reasonable suspicion, since this is as consistent with the concealment of illicit drugs as it is with "the presence of food, chewing gum, tobacco, or a speech defect."[10]  Commonwealth v. Houle, 35 Mass. App. Ct. 474, 476 (1993).  Neither separately nor taken together do these observations provide the specific, articulable facts necessary to justify the degree of intrusion that occurred here.[11]

---

[10] Officer Dodd provided no articulated basis for distinguishing between the various potential explanations.

[11] The Commonwealth also argues that the order allowing the motion to suppress must be reversed because, by opening his mouth, the defendant voluntarily placed the bag of cocaine in plain view.  See Commonwealth v. Sergienko, 399 Mass. 291, 295 (1987) (an officer may use a flashlight to view an object that could otherwise be seen in plain view during the daytime).  Because we conclude that the defendant was seized without reasonable suspicion prior to opening his mouth, this plain view argument fails.  See Commonwealth v. Knowles, 451 Mass. 91, 100 (2008).  We therefore need not consider whether, had there been

Because we conclude that the defendant was seized without reasonable suspicion, the evidence obtained as a result must be suppressed as fruit of the poisonous tree.  <u>Commonwealth</u> v. <u>Damiano</u>, 444 Mass. 444, 453 (2005).  Accordingly, we affirm the order allowing the defendant's motion to suppress.[12]

<u>So ordered</u>.

---

daylight, Officer Dodd would have been able to view the bag of cocaine lodged in the recess between the defendant's tongue and cheek, and whether the defendant's opening his mouth should be viewed as providing consent for the police to examine the interior confines of his mouth using a flashlight.  Nor is it necessary to consider countervailing arguments that such an examination is so particularly intrusive that it necessarily constitutes a constitutional "search," and that police officers' undertaking such a step itself could transform a voluntary police encounter into a seizure.  See, e.g., <u>People</u> v. <u>Harper</u>, 237 Ill. App. 3d 202, 207 (1992) (use of flashlight to view the inside of the mouth constitutes a search); <u>State</u> v. <u>Hardy</u>, 577 N.W.2d 212, 216 (Minn. 1998) (officer's request for individual to open his mouth constitutes a search).  Compare <u>Maryland</u> v. <u>King</u>, 133 S. Ct. 1958, 1968-1969 (2013) (physical intrusion into the interior of a mouth, however minimal, is a search under the Fourth Amendment).

[12] The defendant argues that we could affirm on the alternative ground that Officer Dodd used unreasonable force when he applied "pressure" to the back of the defendant's jaw. Both parties represent that the Boston police department no longer permits its officers to use this sort of procedure to prevent the swallowing of evidence.  The defendant asks us to join those courts in other jurisdictions that have held any degree of choking to be unreasonable and an independent basis for suppression.  See, e.g., <u>People</u> v. <u>Jones</u>, 209 Cal. App. 3d 725, 730 (1989); <u>State</u> v. <u>Hodson</u>, 907 P.2d 1155, 1158 (Utah 1995).  Because we affirm on other grounds, we do not reach the issue.